UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

John T. Thorsen,

        Plaintiff,

vs.

Minter-Weisman Co.,
a Minnesota corporation, and
Core-Mark International, Inc.,

        Defendants.

**COMPLAINT**
**JURY TRIAL DEMANDED**

Court File No. 11-112 MJD/JSM

---

Plaintiff, by his attorneys, Fabian May & Anderson, PLLP, brings this action for damages and other legal and equitable relief for Defendants' violations of laws prohibiting discrimination in employment. Plaintiff states the following as his claims against Defendants:

### JURISDICTION AND VENUE

1. This action arises under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et. seq.* Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, 42 U.S.C. § 12117(a), and 42 U.S.C. § 2000e-5(2).

2. Plaintiff also asserts claims under the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.* These claims fall within the Court's supplemental jurisdiction conferred by 28 U.S.C. § 1367.

3. The events described herein occurred in Minnesota and Defendants conduct business within the state of Minnesota.

SCANNED
JAN 14 2011
U.S. DISTRICT COURT MPLS

## PARTIES

4. Plaintiff John T. Thorsen ("Plaintiff") is an individual who resides in the state of Minnesota.

5. Defendant Minter-Weisman Co. is a Minnesota corporation with a registered address of 590 Park Street #6, St. Paul, Minnesota 55103.

6. Defendant Core-Mark International, Inc. is a Delaware corporation with principal executive offices located at 395 Oyster Point Boulevard, Suite 415, South San Francisco, California 94080.

7. Upon information and belief, Minter-Weisman became a wholly-owned subsidiary of Core-Mark International, Inc. during Plaintiff's employment. During Plaintiff's employment, Minter-Weisman Co. began to operate under the assumed name "Core-Mark International." Minter-Weisman Co. and Core-Mark International, Inc. are hereinafter collectively referred to as "Defendants."

8. At all relevant times, Defendants were Plaintiff's "employer" and Plaintiff was their "employee" within the meaning of 42 U.S.C. § 12111 and Minn. Stat. § 363A.03.

## FACTS RELEVANT TO ALL COUNTS

9. In approximately 1979, Plaintiff was diagnosed with type 1 insulin-dependent diabetes, which substantially limits his body's ability to produce insulin and thereby regulate the glucose content in his blood (Plaintiff's "glucose level"). At all relevant times, Plaintiff's diabetes was treated with insulin pump therapy, in which

Plaintiff wears a pump that introduces insulin at certain time intervals to lower Plaintiff's glucose level.

10. Defendants employed Plaintiff as a Warehouse person, which position he held from on or about May 31, 1994 until his discharge on or about September 11, 2008.

11. Plaintiff's job duties generally included receiving, stocking, and rotating inventory, and preparing customer orders for delivery. Warehouse persons on first shift were required to be able to drive motorized equipment, whereas Warehouse persons on second shift were not.

12. Prior to December 2006, Plaintiff experienced occasional insulin reactions, or episodes during which his glucose level dropped well below normal, while working first shift.

13. In or around December 2006, Defendants told Plaintiff he must submit to an evaluation by occupational medicine specialist Dr. Gary Johnson ("Dr. Johnson") to determine whether Plaintiff could work safely. Dr. Johnson stated he would consult with Plaintiff's endocrinologist, but recommended to Defendants that Plaintiff should in the meantime avoid operating forklifts and motorized pallet jacks, and avoid working from heights. After consulting with Plaintiff's endocrinologist, Dr. Mark P. Stesin ("Dr. Stesin"), Dr. Johnson informed Defendants that Plaintiff could work without restrictions and recommended instead that Defendants accommodate Plaintiff's condition by allowing him to take short breaks as needed to monitor his glucose level and eat a snack.

14. In or around May 2007, Plaintiff suffered an insulin reaction at work. Defendants again required Plaintiff to see Dr. Johnson for evaluation. Dr. Johnson told

Defendants that Plaintiff could work with restrictions, including no work from unguarded heights, no driving vehicles including forklifts, and no work around unguarded hazardous machinery or unguarded hazardous chemicals.

15.  On or about June 4, 2007, Defendants moved Plaintiff to second shift, on which he was not required to operate mechanical machinery and could perform all of the essential functions of the job without violating Dr. Johnson's restrictions.

16.  Defendants' second shift employees normally worked from 3 p.m. until 1 a.m. or later. The change to second shift disrupted Plaintiff's normal meal and snack schedule, and he experienced episodes in July, August, and September 2007 during which his glucose level dropped below normal. Plaintiff addressed these episodes by taking a break to eat a snack or drink some orange juice.

17.  Around this time, Plaintiff's supervisors told him other employees had inquired why he needed so many breaks for meals and snacks. Plaintiff's supervisors told him to be discrete about these breaks so the other employees would not think he was receiving special treatment.

18.  On October 4, 2007, Plaintiff experienced an insulin reaction. Shortly thereafter, Defendants' human resources manager, Laura Schwartz ("Schwartz") demanded Plaintiff sign a release of health information. Schwartz sent the release to Dr. Stesin with a letter asking him to provide Defendants an evaluation of Plaintiff's fitness for work. Defendants also suspended Plaintiff without pay on or about October 11, 2007.

19.  Dr. Stesin replied to Schwartz's letter, informing Defendants that Plaintiff could continue to work with the restrictions imposed by Dr. Johnson. Dr. Stesin also

informed Defendants that Plaintiff had been approved for a Continuous Glucose Sensor, which would assist Plaintiff in monitoring his glucose levels.

20. After Dr. Stesin's reply, Defendants' division president Paul Siegel wrote Dr. Stesin again and asked whether Plaintiff could continue to work with Dr. Johnson's restrictions before his glucose sensor was in place. Dr. Stesin responded in the affirmative, telling Defendants again that Plaintiff could safely work with Dr. Johnson's restrictions even before the glucose sensor was in use.

21. On or about November 2, 2007, Defendants informed Plaintiff he must return to work on November 4, 2007.

22. Shortly after Plaintiff was suspended without pay in October 2007, he contacted the Equal Employment Opportunity Commission ("EEOC") to complain about Defendants' discriminatory conduct. An EEOC representative told Plaintiff the EEOC would investigate the matter. In or around November 2007, Plaintiff met with an EEOC representative who told Plaintiff she would be contacting Defendants.

23. In or around late January 2008, Plaintiff received and began using the glucose sensor.

24. On or about January 30, 2008, after Plaintiff's glucose sensor was in use, Dr. Johnson informed Defendants that Plaintiff could work without restriction. Plaintiff then discussed with Schwartz whether he would be able to return to first shift. During the discussion, Schwartz expressed concerns about putting Plaintiff back on first shift. Plaintiff's glucose sensor beeped during the meeting. Schwartz said, "See, it's beeping right now!" Schwartz did not ask Plaintiff why the sensor beeped. Had she inquired,

5

Plaintiff would have informed Schwartz the sensor beeped because its battery was running low, not because Plaintiff's glucose level was low. Although Schwartz agreed to move Plaintiff to first shift once a position was open, Defendants never moved Plaintiff back to first shift.

25. On or around February 26, 2008, while still working second shift, Plaintiff was required to change out a part on his sensor while at work. To do so, he had to remove the adhesive holding the sensor to his skin. Plaintiff refastened the sensor to his skin using band-aids and cloth tape from Defendants' first aid kit. Later, unbeknownst to Plaintiff at the time, the sensor came loose, causing Plaintiff to suffer an insulin reaction.

26. On or about February 27, 2008, Schwartz called a meeting with Plaintiff and other members of Defendants' management team. Plaintiff explained what happened the day before when his sensor came loose, and explained he had brought extra adhesive to work so it would not happen again. Schwartz told Plaintiff she had heard reports of two other insulin reactions since he started using the sensor. Plaintiff told her there was only one other incident, and that it was not an insulin reaction, but simply a time when his blood sugar was a little low.

27. On or about February 28, 2008, Schwartz sent a request to Dr. Johnson asking him to evaluate Plaintiff and determine whether he could guarantee Plaintiff would have no further insulin reactions at work.

28. Plaintiff met with Dr. Johnson and, on or about April 18, 2008, Dr. Johnson wrote Schwartz a letter stating Plaintiff could work with restrictions. Dr. Johnson recommended Plaintiff not drive motorized vehicles in the workplace, work from

unguarded heights, work with unguarded hazardous machinery, or work with hazardous chemicals. Dr. Johnson recommended these restrictions remain in place for one year.

29. On or about April 24, 2008, Schwartz met with Plaintiff to discuss the letter from Dr. Johnson. Schwartz told Plaintiff that, based on Dr. Johnson's recommendations, Plaintiff would remain on second shift, which did not require him to drive motorized vehicles in the workplace, work from unguarded heights, work with unguarded hazardous machinery, or work with hazardous chemicals. Schwartz also produced a memorandum and asked Plaintiff to sign it. Notwithstanding the fact that Plaintiff could perform all essential functions of a second shift Warehouse person without violating Dr. Johnson's restrictions, the memorandum stated Defendants would terminate Plaintiff's employment if he experienced one more insulin reaction. Plaintiff refused to sign the memorandum.

30. On or about July 10, 2008, Plaintiff asked his supervisor to page a coworker over the intercom so Plaintiff could address a question he had about some work the coworker had done. As Plaintiff explained the situation to his supervisor, his glucose sensor beeped to indicate his glucose level was low. Plaintiff suspended the operation of this insulin pump for a short time so his glucose level would not drop further then drank some orange juice to bring his glucose back up.

31. On or about July 28, 2008, Schwartz held a meeting with Plaintiff and members of Defendants' management team. During the meeting, Schwartz handed Plaintiff a memorandum entitled "Last and Final Warning." The memorandum stated that Plaintiff's manager had alleged that on July 10, 2008, Plaintiff had become

"confused and clearly disoriented," but that Plaintiff was "lucid enough to be able to correct the situation with minimal intervention." The memorandum further stated Plaintiff had "admitted" to suspending his insulin pump, and that Defendants were unsure whether this was a contributing factor to the episode. Defendants did not ask Plaintiff whether suspending the pump was a contributing factor, what would occur when he suspended his insulin pump, or under what circumstances he would or should do so. The memorandum further stated it was a final warning, and that "any future incident of this nature" would result in his termination. Plaintiff disagreed with Schwartz's characterization of his state of mind on July 10, 2008, and asked Schwartz to talk to his supervisor again about what happened.

32. On or about September 10, 2008, the battery in Plaintiff's glucose sensor ran low and he was required to charge it while at work. He took the sensor off, plugged it in to charge, ate a snack, administered some insulin, and went back to work. Later, as Plaintiff was sitting down to eat "lunch," he experienced an insulin reaction. Other employees called 911, and an EMT arrived and administered glucose to Plaintiff intravenously. Plaintiff recovered, ate his lunch, and went home.

33. On or about September 11, 2008, Defendants terminated Plaintiff's employment.

## CLAIMS AGAINST BOTH DEFENDANTS

### COUNT I

### DISABILITY DISCRIMINATION PURSUANT TO THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, ET SEQ.

34. By reference hereto, Plaintiff hereby incorporates the paragraphs above.

35. 42 U.S.C. § 12112 provides that it is unlawful for an employer to discriminate against a qualified individual with a disability because of the disability of such individual in regard to the individual's discharge and the terms, conditions, and privileges of employment, including not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee.

36. At all relevant times, Plaintiff was a qualified individual with a disability.

37. By their conduct, Defendants discriminated against and discharged Plaintiff because of his disability in violation of 42 U.S.C. § 12112.

38. As a direct and proximate result of Defendants' violation of 42 U.S.C. § 12112, Plaintiff has suffered and continues to suffer loss of income, mental anguish, emotional distress and humiliation, embarrassment, loss of reputation, and other damages in an amount in excess of $75,000.

### COUNT II

### RETALIATION PURSUANT TO 42 U.S.C. § 12203.

39. By reference hereto, Plaintiff hereby incorporates the paragraphs above.

40. 42 U.S.C. § 12203(a) provides that it is an unlawful employment practice for an employer to discriminate against an employee for opposing any act or practice of disability discrimination or for making a complaint of disability discrimination.

41. By their conduct, Defendants violated 42 U.S.C. § 12203(a).

42. As a direct and proximate result of Defendants' violation of 42 U.S.C. § 12203(a), Plaintiff has suffered and continues to suffer loss of income, mental anguish, emotional distress and humiliation, embarrassment, loss of reputation, and other damages in an amount in excess of $75,000.

## COUNT III

### DISABILITY DISCRIMINATION PURSUANT TO THE MINNESOTA HUMAN RIGHTS ACT, MINN. STAT. § 363A.01, ET SEQ.

43. By reference hereto, Plaintiff hereby incorporates the paragraphs above.

44. Minnesota Statute § 363A.08 provides that it is an unfair employment practice for an employer, because of disability, to discharge an employee or discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment, including not making reasonable accommodation to the known disability of a qualified disabled person.

45. At all relevant times, Plaintiff was a qualified disabled person.

46. By their conduct, Defendants discriminated against and discharged Plaintiff because of his disability in violation of Minn. Stat. § 363A.08.

47. As a direct and proximate result of Defendants' violation of Minn. Stat. § 363A.08, Plaintiff has suffered and continues to suffer loss of income, mental anguish,

emotional distress and humiliation, embarrassment, loss of reputation, and other damages in an amount greatly in excess of $75,000.

## COUNT IV

### REPRISAL PURSUANT TO MINN. STAT. § 363A.15

48. By reference hereto, Plaintiff hereby incorporates the paragraphs above.

49. Minn. Stat. § 363A.15 provides that it is an unfair discriminatory practice for any person to intentionally engage in any reprisal against any person because that person opposed a practice or act of discrimination or filed a complaint or charge of discrimination.

50. By their conduct, Defendants violated Minn. Stat. § 363A.15.

51. As a direct and proximate result of Defendants' violation, Plaintiff has suffered and continues to suffer loss of income, mental anguish, emotional distress and humiliation, embarrassment, loss of reputation, and other damages in an amount greatly in excess of $75,000.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff John T. Thorsen prays for judgment against Defendants Minter-Weisman Co. and Core-Mark International, Inc. as follows:

A. For all relief available under the Americans with Disabilities Act;

B. For all relief available under the Minnesota Human Rights Act; and

C. For such other and further relief and the court deems just and equitable.

Dated: 1/14/11

                              FABIAN MAY & ANDERSON, PLLP

                              John A. Fabian, #13482X
                              David H. Redden, #391496
                              1285 IDS Center
                              80 South Eighth Street
                              Minneapolis, MN 55402
                              (612) 353-3340
                              ATTORNEYS FOR PLAINTIFF

# Fabian May & Anderson
## PLLP

1285 IDS Center ■ 80 South Eighth Street ■ Minneapolis, MN 55402
612.353.3340 Phone ■ 612.455.2217 Fax
www.fmalawyers.com

January 14, 2011

**VIA MESSENGER**
Clerk's Office
202 U.S. Courthouse
300 S. 4th Street
Minneapolis, MN 55415

Re:   *John T. Thorsen v. Minter-Weisman Co., and Core-Mark International, Inc.*

Dear Sir or Madam:

    Enclosed please find the following:
1. Summons in a Civil Case;
2. Civil Cover Sheet;
3. Complaint; and
4. check in the amount of $350.00 payable to Clerk of the Court as the filing fee for a new case, John T. Thorsen v. Minter-Weisman Co., and Core-Mark International, Inc.

    Although we would normally electronically file the Summons, Complaint, and Civil Cover Sheet, I am enclosing those documents herewith and request that you please **issue the Summons to the messenger at this time.**

    Thank you for your time and attention to this matter.

                                   Sincerely,

                                   FABIAN MAY & ANDERSON, PLLP

                                   Michelle F. Achterberg
                                   Paralegal to John Fabian

Enclosure

*RECEIVED JAN 14 2011 CLERK U.S. DISTRICT COURT MINNEAPOLIS, MINNESOTA*